# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**FEDERAL TRADE COMMISSION,**

**Plaintiff,**

**v.**                                                   **Case No. 8:08-CV-2062-T-27AEP**

**RCA CREDIT SERVICES, LLC a Florida
Corporation, et al.,**

**Defendants.**

_____/

## ORDER

**BEFORE THE COURT** is Plaintiff's Motion for Summary Judgment (Dkt. 99), to which *pro se* Defendant Rick Lee Crosby, Jr., has responded (Dkts. 100, 104). Plaintiff brought this action against Defendants under (1) the Credit Repair Organization Act ("CROA") for Defendants' allegedly misleading statements, illegal billing practices, and failure to make required disclosures and (2) the Federal Trade Commission Act for allegedly deceptive practices. Plaintiff alleges that Defendants violated the FTC Act and CROA by representing to consumers that they could increase consumers' credit scores into the 700s in as little as 30 days by associating consumers with positive credit information belonging to unrelated individuals or entities and by removing all negative information from consumers' credit reports. As set forth below, Plaintiff's Motion for Summary Judgment is GRANTED in part.[1]

_____

[1] On July 20, 2010, the court announced its ruling on the record and summarized its findings. The announced findings and conclusions are incorporated herein.

## *Background*

Plaintiff Federal Trade Commission (the "FTC" or the "Commission") is an independent agency of the United States created by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41 *et seq*. The FTC is charged with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits deceptive acts and practices in or affecting commerce. Pursuant to Section 410(a) of the Credit Repair Organizations Act (the "CROA"), 15 U.S.C. § 1679h(a), the FTC also has the authority to enforce provisions of the CROA relating to credit repair organizations. Section 410(b) of the CROA, 15 U.S.C. § 1679h(b), grants the FTC authority to enforce the CROA in the same manner as it enforces the FTC Act. Section 13(b) of the FTC Act authorizes the FTC to bring suit in federal district court to enjoin violations or threatened violations of the FTC Act. 15 U.S.C. § 53(b).

Corporate Defendant RCA Credit Services, LLC ("RCA") is a Florida limited liability company organized in September, 2005.[2] Defendant Rick Lee Crosby, Jr. ("Crosby") is a resident of Florida, the founder and owner of RCA, and one of two managing members of the company.[3] Crosby established RCA by filing Articles of Organization with the Florida Secretary of State in September, 2005, listing himself as the registered agent. *See* Childs Decl. Att. E; Crosby Dep. at 23-24; Pl. Ans. (Dkt. 35) ¶ 6; Dkt. 112 ¶ 9B-C.

The FTC commenced this action by filing a Complaint and Motion for Temporary Restraining Order ("TRO") on October 16, 2008. The motion for TRO (Dkt. 7) was granted and,

---

[2] *See* June 1, 2009 deposition of Rick Lee Crosby ("Crosby Dep." [Dkt. 99-2 at 38-257]) at 57; Pretrial Statement, Dkt. 112, ¶ 9A-B.

[3] *See* Crosby Dep. at 9:20-21; 23:18-24:18; Pl. Motion for TRO (Dkt. 4), Oct. 8, 2008 Declaration of Beverly Childs ("Childs Decl."), Att. E at 4.

following a hearing, a preliminary injunction was entered (Dkt. 29). On February 25, 2009, a default judgment was entered against Defendant Brady Wellington in the amount of $204,517.13. (Dkt. 63).

The March 1, 2010 Order granting counsel for RCA and Crosby's motion to withdraw directed RCA to obtain new counsel within ten days. (Dkt. 98).[4] The Order repeated an earlier caution that RCA could not appear except through counsel and warned that RCA's failure to timely obtain new counsel would result in the Court entertaining a motion for default judgment pursuant to Fed. R. Civ. P. 55. (Dkt. 98). A subsequent order informing Crosby of the requirements of Fed. R. Civ. P. 56 warned that any response to the FTC's motion for summary judgment that purported to be filed on behalf of RCA by a person not admitted to practice in this Court would be stricken. (Dkt. 101). Finally, at the June 11, 2010 pretrial conference, the Court informed Crosby that RCA's failure to obtain counsel would result in a default judgment being entered against RCA. Notwithstanding, RCA has not complied with the Court's March 1, 2010 Order. Accordingly, Crosby's responses to the FTC's motion for summary judgment, to the extent they purport to be filed on behalf of RCA, are disregarded.

Except where otherwise noted, the following facts are undisputed. RCA solicited consumers nationwide through two internet websites, www.RCACredit.com and www.RCAcreditservices.com. *See* Childs Decl. Att. B, D.[5] Interested consumers called RCA's toll-free number, heard a recorded

---

[4] *See* Local Rule 2.01(a); *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985) ("[A] corporation is an artificial entity that can act only through agents, cannot appear *pro se,* and must be represented by counsel"); *Lattanzio v. COMTA*, 481 F.3d 137, 140 (2d. Cir. 2007) ("[A] limited liability company . . . may appear in federal court only through a licensed attorney."); *Energy Lighting Mgmt., LLC v. Kinder*, 363 F. Supp. 2d 1331, 1332 (M.D. Fla. 2005).

[5] Defendants state that RCAcreditservices.com "was never used nor advertised." *See* Pl. First Set of Requests for Admission to Def. RCA Credit Services, LLC ("Pl. 1st RFA" [Dkt. 99-3]), No. 18; RCA Response to Pl. 1st RFA

message, and were invited to leave contact information.[6] An RCA representative then contacted the consumers and pitched RCA's services. *See* Stahl Decl. ¶¶ 4-6; Crosby Dep. at 89.

RCA's websites invited consumers, with RCA's assistance, to "Boost Your Credit Score Into the 700's in as little as 30 days." Childs Decl. Att. B at 1, 7 (www.rcacredit.com); Childs Decl. Att. D at 1 (rcacreditservices.com). The same message was repeated in an audio message on RCA's website, *see* Childs Att. C 3:4-7; in emails to consumers, *see* Oct. 21, 2008 Supplemental Declaration of Melvina Jones ("Jones Supp. Decl." [Dkt. 18-2]), Att. H at 2; Crosby Dep., Ex. 8; in prerecorded messages consumers heard when they called RCA, *see* Stahl. Decl. Att. A 4:1-9; Childs Decl. Att. 3:14-15; and in live telephone calls with RCA representatives, *see* Pl. Motion for TRO, July 31, 2008 Declaration of Jeannette Harris ("Harris Decl.") ¶¶ 3, 7-8 (RCA representative Brady Wellington told Harris that her credit score would improve to over 700 within a month); Pl. Motion for TRO, July 31, 2008 Declaration of Carmela Marolda ("Marolda Decl.") ¶ 11 (Wellington told Marolda that her credit score would rise to over 700 within 30 days); Pl. Motion for TRO, Aug. 25, 2008 Declaration of Kenneth Thiefault ("Thiefault Decl.") ¶ 11 (RCA representative told Thiefault RCA could raise his credit score above 700 within 30 days).

Defendants represented that consumers could achieve this result through two actions. First, Defendants offered to sell consumers associations with positive credit information belonging to unrelated entities or persons. Specifically, Defendants offered to register the consumer as an "authorized user" of one to three lines of credit with positive payment history, with the assurance

---

[Dkt. 99-3], No. 18. Defendants operated their website until about November, 2008, when the website became inactive. *See* June 3, 2009 deposition of Kevin Bessant ("Bessant Dep." [Dkt. 99-2 at 3-37]) at 33.

[6] *See* Pl. Motion for TRO, Ex. 11, Sept. 15, 2008 Declaration of Ann Stahl ("Stahl Decl.") ¶ 3; Crosby Dep. at 88.

that the association with the line of credit would increase the consumer's credit score. *See* Stahl Decl. Att A at 12, ll. 13, 15; Childs Decl. Att. A at 7; Harris Decl. ¶ 8; Jones Decl. ¶ 9; Marolda Decl. ¶ 9; Mitchell Decl. ¶ 6; Pl. Motion for TRO, July 21, 2008 Declaration of Donald Smith ("Smith Decl.") ¶ 8. These lines of credit are referred to as "trade lines." (Dkt. 99 at 7). To the extent consumers became authorized users on such accounts, however, they did not have access to the underlying lines of credit, because they did not receive the account numbers or credit cards.[7]

Although the first page of RCA's website promised to increase consumers' credit scores into the 700s in as little as 30 days, another page on the website states that it may and usually does take longer. That webpage, under the heading "Questions," states that "it generally takes 60 to 90 days for the trade lines to report" and asks clients to allow "a minimum of 60 to 90 days" for the trade lines to appear on their credit reports. Childs Decl. Att. B at 15, Att. D at 6; *see also* Childs Decl. Att. B at 4; Stahl Decl. Att. A at 12 (RCA representative stated that "it takes about 30-60 days" for the information to be reported); Childs Att. A at 8 (RCA representative told undercover FTC investigator that "it takes . . . around 30 to 90 days"); *cf.* Pl. Motion for TRO, Aug. 24, 2008 Declaration of Bryne Mitchell ("Mitchell Decl.") ¶ 5 (Wellington told Mitchell it would cost $800 to get his credit score into the 700s within 30-90 days);

RCA's website promised "100% Guaranteed Results." Childs Att. B at 1, Att. D at 1; RCA Response to Pl. 1st RFA No. 30. The website provided a "100% guarantee" that every trade line purchased would be reported to the three major credit reporting agencies and that the consumer's credit score would increase as a result. Childs Decl. Att. B at 15, Att. D at 6; *see also* Childs Decl.

---

[7] *See* Jones Decl. ¶ 10; Feb. 23, 2009 deposition of Robert Liskiewicz ("Liskiewicz Dep." [Dkt. 99-2 at 261-98]) at 29; Crosby Dep. at 160.

Att. B at 3. However, RCA's "Questions" webpage states that, because

> [e]very clients [sic] credit report is different . . . each clients [sic] credit scores [sic] increase will very depending on how many negative accounts that [sic] have on their credit report. Once you become a client, we will coach you through the necessary steps needed to help you remove and dispute any negative accounts that you have.

Childs Decl. Att. B at 15, Att. D at 6; *see also* Childs Decl. Att. B at 16 ("Everybody's credit score increase will vary depending on how many trade lines are purchased and how many negatives are removed."); Childs Decl. Att. D at 7 (same).

Second, Defendants invited consumers, with Defendants' assistance, to "Remove ANY or ALL Negative Accounts From Your Credit Report." Childs Att. B. at 1, 7 (www.rcacredit.com); Childs Decl. Att. D at 1 (rcacreditservices.com); *see also* Stahl Att. A at 4; Mitchell Decl. ¶ 7. For example, in October, 2008, RCA sent consumers email solicitations announcing that Crosby could "COMPLETELY REMOVE EVERY NEGITIVE [sic] FROM YOUR [CREDIT] FILE IN 7 Days and Raise Your FICO Score Instantly!" through a "7-day credit repair special promo." *See* Smith Supp. Decl. Att. A, B; Jones Supp. Decl. Att. I, J; RCA Response to Pl. 1st RFA No. 70; Crosby Dep. at 93-99 & Exs. 8-12. The email solicitations assured consumers that Crosby "can REMOVE all negatives, charge offs, judgments, tax liens, foreclosure and EVEN BANKRUPTCY" from consumers' credit files within seven days (or 10-14 days, for a bankruptcy) and guaranteed the removal within that time. RCA Response to Pl. 1st RFA Nos. 71-73.[8] Negative information, such as delinquent accounts or late payments, is considered in calculating a consumer's FICO score.[9]

---

[8] Crosby made a substantially similar offer to a dissatisfied RCA client. *See* Feb. 24, 2009 deposition of Ronald Wray ("Wray Dep" [Dkt. 99-3 at 54-90]) at 25:25-28:9; Crosby Dep. at 96-97, 103-04.

[9] *See* Pl. Motion for TRO, Sept. 11, 2008 Declaration of Thomas Quinn, Vice President of Global Solutions for Fair Isaac Corporation ("Quinn Decl.") ¶ 4. The Fair Isaac Corporation is a provider of analytics and decision management technology and has developed the most widely used consumer credit score, commonly known as a

After a consumer decided to engage RCA's services, RCA representatives collected fees ranging from $500 to $3,000 or more, depending on how many trade lines the consumer purchased. *See* Childs Decl. Att. B at 5, 8, 12, 19 (website lists the silver, gold, and platinum RCA packages of credit lines costing $1,300, $2,200, and $3,000, respectively), Childs Decl. Att. D at 3, 10 (website lists the silver, gold, and platinum RCA packages of credit lines costing $1,300, $2,400, and $3,300, respectively); Harris Decl. ¶ 11 (consumer paid $1,480 for a three trade line package); Pl. Motion for TRO, Sept. 15, 2008 Declaration of Rich Chiniquy ("Chiniquy Decl.") ¶ 16 (consumer paid $950 for one trade line); Jones Decl. ¶ 17 ($1500 for three trade lines); Marolda Decl. ¶ 12 ($3,000); Mitchell Decl. ¶ 9 ($800); Smith Decl. ¶ 11 ($600 for one trade line); Thiefault Decl. ¶ 14 ($500).

After consumers submitted payment information,[10] RCA representatives emailed or instructed consumers to download a "Confirmation Agreement" as well as a "Payment Authorization" authorizing Rick Crosby & Associates to collect payment. *See, e.g.*, Jones Decl. Att. B-C; Harris Decl. Att. A-B; Pl. Ans. ¶ 12 & Ex. (Dkt. 35-1 at 1-3).[11] Defendants did not provide consumers with any additional documents. *See* Crosby Dep. at 91; Jones Decl. ¶ 16; Harris Decl. ¶ 12; Thiefault Decl. ¶¶ 15-17.

The Confirmation Agreement (Dkt. 35-1 at 1-3) states that the consumer understands the possibility that becoming an authorized user on established credit card accounts can lower one's score "if the accounts have a bad credit history," Confirmation Agreement ¶ 2, but adds the assurance that, "[t]hankfully, all the accounts available through RCA have been verified by legal

---

FICO score. FICO scores range from 300 to 850. *See* Quinn Decl. ¶¶ 2-4.

[10] *See* RCA Response to Pl. 1st RFA No. 32 (admitting that the Confirmation Agreement "was . . . received by consumers after they had already submitted payment information to RCA."); Mitchell Decl. ¶¶ 9-10.

[11] The Confirmation Agreement did not change over time. *See* Crosby Dep. at 92.

counsel, and have a verified seasoned history of at least 24 months," *id.* The Confirmation Agreement further states that it may take 90 days "for all trade lines to appear on [the consumer's] credit reports," *id.* ¶ 5, and that "the selected institutions for [the consumer's] trade lines may elect any time NOT to report to the credit bureaus, and [the consumer] will hold [RCA] harmless in the event that the trade lines do not report," *id.* Finally, the Confirmation Agreement states that the consumer understands that

> this program can take 60-90 days to report on my credit file after being reported; and will take from 90 days to a full year for maximum impact on my credit score improvement. [RCA] cannot control the amount of time it takes each bureau to post credit information reported by any subscriber, not [sic] predict the maximum impact of our service for each clients' [sic] circumstances. Age of credit history, age of applicant, age of recent bankruptcies, etc., further compound this issue.

*Id.* ¶ 9.

The FTC presents evidence that, in numerous instances, the trade lines never appeared on consumers' credit reports. *See* Harris Decl. ¶ 20; Jones Decl. ¶ 29; Marolda Decl. ¶ 17; Mitchell Decl. ¶ 13; Smith Decl. ¶ 19; Wray Dep. at 23:8-20, 29:3-5; Bessant Dep. at 26:5-7. One consumer declares that a trade line did appear on his credit report soon after he purchased a trade line from RCA. Chiniquy Decl. ¶ 17. However, this consumer states that (1) it was not the trade line with Bank of America that RCA promised, (2) it had a credit limit ($3,800) far lower than the amount promised ($25,000), and (3) it raised his score by only "two or three points at most." *Id.* Other consumers who observed a modest increase in their scores stated that it resulted solely from their own independent efforts, not from any action taken by RCA. *See* Mitchell Decl. ¶ 13; Wray Dep. at 28:18-29:8. Numerous consumers indicated that Defendants never raised their credit scores above 700. *See* Harris Decl. ¶ 19; Jones Decl. ¶ 20; Marolda Decl. ¶ 13; Mitchell Decl. ¶¶ 12-14. RCA's

8

records indicate that three consumers achieved credit scores over 700. *See* Crosby Dep. at 150:8-12. Crosby could not identify any other consumer who increased his score to over 700. *Id.* at 150:13-151:2.

<h2 align="center">*Standard*</h2>

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)(2). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24.

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## Discussion

### Section 5(a) of the FTC Act

Section 5(a) of the FTC Act prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "To establish that an act or practice is deceptive, the FTC must show that (1) there was a representation or omission, (2) the representation or omission was likely to mislead consumers acting reasonably under the circumstances, and (3) the representation or omission was material." *FTC v. Peoples Credit First, LLC*, No. 8:03-CV-2353, 2005 WL 3468588, at *5 (M.D. Fla. Dec. 18, 2005) (citing *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)), *aff'd*, 244 F. Appx. 942 (11th Cir. 2007).

In determining whether a representation is likely to mislead consumers acting reasonably, courts consider the net impression created. *See FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).[12] A representation is material if it is of a kind usually relied upon by a reasonably prudent person. *FTC. v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007) (citation omitted). "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *Id.* at 1267.

### Count I

Defendants' website represented that consumers could boost their credit scores into the 700s

---

[12] *See also Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982) ("'[T]he tendency of the advertising to deceive must be judged by viewing it as a whole' .... The impression created by the advertising, not its literal truth or falsity, is the [criterion].") (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976)); *FTC v. Peoples Credit First, LLC*, 244 F. Appx. 942, 944 (11th Cir. 2007) ("[T]he undisputed evidence establishes that the appellants made material representations, express or implied, that were likely to mislead reasonable consumers. The fact that the words . . . are technically or literally true is not persuasive.").

and "Remove ANY and ALL Negative Accounts From Your Credit Report" with Defendants' assistance.[13] The claim is made in a bold, distinct manner on the first page of the website that includes no disclosure, qualification, or explanation of what credit circumstances would permit the promised result. Moreover, Defendants repeated the assertion in telephone calls and emails. *See* Smith Supp. Decl. Att. A, B; Jones Supp. Decl. Att. I, J; RCA Response to Pl. 1st RFA No. 70; Crosby Dep. at 93-99 & Exs. 8-12.

The FTC presented uncontroverted evidence that no credit repair company can legitimately remove or enable consumers to remove all negative entries from a consumer's credit report. Tim Puckett, Fraud and Security Manager of the National Consumer Assistance Center of Experian Information Solutions, Inc.,[14] avers that accurate negative information which is not obsolete[15] cannot be deleted. *See* Puckett Decl. ¶¶ 11-22. Consumer experience indicating that RCA did not in fact remove any accurate, non-obsolete negative information from their credit reports confirms Pucket's averment. *See* Mitchell Decl. ¶¶ 7, 14; Wray Dep. at 27:16-28:17. In fact, Crosby admits that Defendants did not remove any negative information from any consumer's credit report. Crosby Dep. at 183; RCA Response to Pl. 1st RFA No. 32. In sum, undisputed record evidence demonstrates that RCA's representations that it could remove or help consumers remove all negative information from consumers' credit reports were false.

---

[13] *See* RCA Response to Pl. 1st RFA No. 29. The printed versions of the websites invite consumers to "Remove ANY or ALL [not any *and* all] Negative Accounts From Your Credit Report" *See* Childs Decl. Att. B. at 1, 7; *Id.* Att. D at 1.

[14] Experian is one of the three major credit reporting agencies in the United States. *See* Pl. Motion for TRO, Sept. 23, 2008 Declaration of Tim Puckett ("Puckett Decl.") ¶¶ 2, 22.

[15] The Fair Credit Reporting Act limits how long a credit reporting agency may maintain certain entries. *See* 15 U.S.C. § 1681c. Generally, bankruptcies may be reported for ten years; other negative information may be reported for seven years. *See* 15 U.S.C. § 1681c(a). Older items are referred to as "obsolete."

Crosby avers generally that RCA made no false or misleading representations.[16]   However, Crosby admits that the statement quoted above appeared on RCA's website.   *See* RCA Response to Pl. 1st RFA No. 29; *see also* Crosby Dep. 43:15-44:3; 83:13-87:16.   That statement cannot be construed as anything other than a representation that RCA could and would, for those consumers who became clients, remove or help them remove any and all negative information, including accurate, non-obsolete information, from their credit reports.   Moreover, it is undisputed that in October, 2008, RCA sent consumers emails offering to completely remove, within seven days, all negative information in the consumers' credit files for a fee.   *See* RCA Response to Pl. 1st RFA Nos76. 70-73; Crosby Dep. at 93-99.   These representations were deceptive as a matter of law and no reasonable fact-finder could conclude otherwise.   *See* 15 U.S.C. § 1679c (CROA provision mandating a written disclosure to consumers that neither a consumer nor a credit repair organization "has the right to have accurate, current, and verifiable information removed from [a consumer's] credit report.").[17]

Because the purpose of Defendants' business was ostensibly to increase credit scores, Defendants' express representations regarding their ability to remove or help consumers remove negative information from their credit reports were material.   *See Transnet Wireless*, 506 F. Supp. 2d at 1266 ("Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material.").   Accordingly, the FTC is entitled to

---

[16]  April 26, 2010 Affidavit of Rick Lee Crosby, Jr. ("2d Crosby Aff." [Dkt. 104]) ¶ 2.

[17]  *See also* H.R. Rep. No. 103-486 (1994) (House Report on the Consumer Reporting Reform Act of 1994, the immediate predecessor to the CROA), 1994 WL 164513, at *63 (noting that certain "credit repair businesses, through advertisements and oral representations, lead consumers to believe that adverse information in their consumer reports can be deleted or modified regardless of its accuracy . . . however, accurate, adverse information may be reported for 7 years, or in the case of bankruptcy, 10 years. Therefore, such representations by credit repair clinics are often misleading . . . .").

summary judgment as to Count One.

*Count II*

Defendants admit that their website represented that RCA could boost consumers' credit scores into the 700s in as little as 30 days. RCA Response to Pl. 1st RFA No. 28; Dkt. 112 ¶ 9T; *see also* Childs Decl. Att. B at 1, 7; Att. C at 3:4-7; Att. D at 1. That representation was repeated to consumers in numerous telephone calls and emails. *See* Jones Supp. Decl. Att. H at 2, Att. I at 1, J. at 1; Smith Supp. Decl. Att. A at 1, B at 1, C. at 1, D at 1; Stahl Decl. Att. A at 4:3, 5:22-23, 7:10-11; Childs Att. A at 3:14-15; Harris Decl. ¶¶ 3,7; Jones Decl. ¶ 9; Marolda Decl. ¶ 9; Mitchell Decl. ¶ 5; Smith ¶ 8; Thiefault Decl. ¶ 9. However, uncontroverted record evidence establishes that, for many consumers (including more than 95% of consumers with FICO scores below 600), their FICO scores cannot be raised to over 700 "within 30 days." Quinn Decl. ¶¶ 7-10.

Notwithstanding, viewing the evidence in a light most favorable to the non-moving parties, and drawing all factual inferences in their favor, Quinn's declaration does not demonstrate the falsity of Defendants' claim that they could boost the credit score of any consumer purchasing Defendants' services in as little as 30 days. Quinn states only that, for many consumers, their FICO scores cannot be raised to over 700 "within 30 days." However, the record contains evidence that, construed favorably to Defendants, tends to show that Defendants did not convey the impression that the promised result could always or usually be achieved within that time. *See* Childs Decl. Att. B at 1, 7; Att. C at 3:4-7; Att. D at 1 (representing that RCA could boost consumers' credit scores into the 700s "*in as little as* 30 days" (emphasis added); *see also* Childs Decl. Att. A at 8, 11-12, Att. B at 4, 15, Att. D at 6; Stahl Decl. Att. A at 12; Mitchell Decl. ¶ 5. Accordingly, the FTC is not entitled to summary judgment as to Count II.

13

The CROA is intended

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

To achieve these ends, the CROA regulates the activities of "credit repair organizations," which are defined to include

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . . .

15 U.S.C. § 1679a(3)(A).

Defendants alleged in their Answer that the CROA is inapplicable because Defendants did not provide or offer credit repair services.[18]  Crosby repeats this contention in the pretrial statement and his responses to the FTC's motion for summary judgment.  In support of this contention, Crosby contends that RCA sold a product (the trade lines), not a service.  *See* Dkt. 100 at 4.  Moreover, Crosby avers that, although in some cases Brady Wellington offered "FREE advice to clients so they could learn options that a customer had so they could remove ANY or ALL negative information from their credit report on their own," RCA never sold that information or collected fees for providing it.  2d Crosby Aff. ¶¶ 4-5.  An RCA representative told an undercover FTC investigator

---

[18] *See* Defs. Ans. ¶¶ 1, 9-18, 23-25, 30-38, 40, 42, 44, 46.

that RCA's assistance in removing negative information from a client's file was "free."[19] Additionally, an audio message on RCA's websites states: "The only costs involved are for the positive lines of credit that are provided by [RCA's] lenders." Childs Att. C at 5:4-5.

To establish that Defendants operated as a credit repair organization within the meaning of the CROA, it must be shown that they "(1) used any instrumentality of interstate commerce, or the mails, to (2) sell, provide, or perform (or represent that they could do so) (3) in return for valuable consideration (4) services or advice about services (5) for the express or implied purpose of improving a consumer's credit record, credit history, or credit rating." *Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 511 (N.D. Ga. 2006) (citing 15 U.S.C. § 1679a(3)).[20]

The undisputed facts establish that Defendants used instrumentalities of interstate commerce (the Internet and telephone communications) to represent that they could and would provide, in return for payment, services and advice about services expressly intended to improve consumers'

---

[19] Wellington told the FTC undercover investigator that, as part of RCA's "free, step-by-step credit repair process," RCA would help the consumer identify and remove negative information from the consumer's credit file (evidently, by providing dispute letters and advice on disputing negative information with the credit reporting agencies). Stahl Decl. Att. A at 13, 15-16; *cf.* Childs Att. A at 8-10, 12. Wellington also stated that "you're not hiring us for the credit repair side of it. You're hiring use for the positives [*i.e.*, for the trade lines]." Stahl Decl. Att. A at 17. Wellington explained that, apart from the trade lines, which was "where we basically make our money and charge our fee," everything RCA could do for the consumer, the consumer could accomplish on his own. *Id.* at 14.

[20] Although the definition literally covers all paid services offered to improve a consumer's "credit record, credit history, or credit rating," some courts have construed it as excluding certain services intended to provide information on how consumers can take steps to improve their credit in the future. *See Hillis*, 237 F.R.D. at 512-16 (inferring from the statute's purpose and the legislative history that the language referring to services to improve a consumer's "credit record, credit history, or credit rating" should be construed as limited to services offered to improve a consumer's historical credit record.). *But cf. Helms*, 436 F. Supp. 2d at 1232-33 (declining to limit the language to exclude credit monitoring service); *Reynolds v. Credit Solutions, Inc.*, 541 F. Supp. 2d 1248, 1255-57 (N.D. Ala. 2008) (criticizing *Hillis* as departing from the plain language of the CROA), *vacated by Picard v. Credit Solutions, Inc.*, 564 F.3d 1249, 1256 (11th Cir. 2009) (concluding that, as the issue was to be decided in the first instance by the arbitrator,"[t]he district court's ruling on this issue was premature."); *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 276 n.20 (D. Mass. 2008) (cautioning that "a broad exception [to the CROA] for companies offering facially forward-looking services poses the . . . danger of opening loopholes in the statute's coverage.").

credit records, credit histories, and credit ratings.

First, as noted, Defendants represented that they could, and in return for payment, would remove or help consumers remove negative information from their credit reports. Notwithstanding Crosby and Wellington's characterization of this service as "free," the undisputed facts show that it was represented as available to *clients*, *i.e.*, consumers who purchased Defendants' services. *See* Childs Att. B at 3 ("Once you become a client a certified RCA Credit expert will be assigned to your case to ensure your success and coach you on ways to remove negative remarks and unpaid debts from your credit report . . . ."); Childs Att. A at 4 (same). Indeed, in the conversation characterizing the service as "free," Wellington stated to the FTC investigator that RCA's credit repair service would be provided "*because* you're hiring us for a guaranteed increase in your score." Stahl Decl. Att. A at 13 (emphasis added). Wellington characterized this credit repair service as one of the "basic three" services provided by RCA. *Id.* at 15. Moreover, as noted, RCA's October, 2008, email solicitations expressly offered to remove negative information from consumers' credit reports for a fee. *See* Smith Supp. Decl., Att. A, B ($500-$1,000 per credit reporting agency); Jones Supp. Decl. Att. I, Att. J (same); Crosby Dep. at 93-99 & Exs. 8-12.

Second, even if the offer to register consumers as authorized users on credit lines with positive payment history is more accurately characterized as an offer of a product rather than as a service, it was offered in a bundle together with services offered for the express purpose of improving consumers' credit scores. In short, because Defendants offered to provide services for money and represented that their services would improve clients' credit reports and credit scores, Defendants operated as a credit repair organization within the meaning of the CROA.

*Count III*

The CROA prohibits a credit repair organization from charging or receiving "any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b). Defendants admit they collected money from consumers "in advance of the [sic] RCA's purchase of . . . trade lines for its third party sellers' inventory." Ans. ¶ 16. *See also* Crosby Dep. at 91:5-8; Chiniquy Decl. ¶ 16; Harris Decl. ¶ 11; Jones Decl. ¶ 17; Marolda Decl. ¶ 12; Mitchell Decl. ¶ 9; Smith Decl. ¶ 11; Thiefault ¶ 14 (consumers paid for credit repair services but no trade lines appeared on their credit reports); RCA Response to Pl. 1st RFA No. 37. Accordingly, the FTC is entitled to summary judgment as to Count III.

*Counts IV-VI*

The CROA requires a credit repair organization to provide prescribed disclosures to consumers. Before executing a contract or agreement with a consumer, a credit repair organization must provide the consumer a separate written statement of "Consumer Credit File Rights Under State and Federal Law" in a statutorily prescribed form. *See* 15 U.S.C. § 1679c(a), (b). It is undisputed that Defendants never provided this mandated disclosure in the prescribed form. *See* Crosby Dep. at 91:15-17; RCA Response to Pl. 1st RFA No. 38. Accordingly, the FTC is entitled to summary judgment as to Count IV.

The CROA also prohibits a credit repair organization from providing any services to a consumer until (1) the consumer has signed a written and dated contract for the purchase of such service and (2) three business days have passed since the date the contract was signed. *See* 15 U.S.C. § 1679d(a), (b). The contract must contain "a conspicuous statement in bold face type, in immediate

17

proximity to the space reserved for the consumer's signature on the contract," stating that the consumer may cancel the contract without penalty or obligation at any time before midnight of the third business day after the date on which the consumer signs the contract. 15 U.S.C. § 1679d(b)(4). The required statement does not appear in RCA's Confirmation Agreement. *See* Jones Decl. Att. B-C; Harris Decl. Att. A, B; Pl. Ans. ¶ 12 & Ex., Dkt. 35-1 at 1-3.

The CROA also requires the credit repair organization to provide the consumer, together with the contract, a prescribed "Notice of Cancellation" that the consumer can use to cancel the contract. 15 U.S.C. § 1679e(b). It is undisputed that Defendants did not provide the required cancellation form to its clients. *See* Crosby Dep. at 91:15-17; RCA Response to Pl. 1st RFA No. 40; Jones Decl. ¶ 16; *see also* Harris Decl. ¶ 12; Thiefault ¶ 15-17. Accordingly, the FTC is entitled to summary judgment as to Counts V and VI.

### Count VII

The CROA prohibits any person from making or using "any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a).[21] "[L]iability attaches even if the representation . . . is not made for the purpose of induc[ing] consumers to purchase a particular service or good." *FTC v. Gill*, 265 F.3d 944, 955 (9th Cir. 2001) (citation and internal quotation marks omitted). "All the FTC must show to establish [a violation] . . . is an untrue or misleading statement regarding the services of the [credit repair organization]." *Id.* Moreover,

---

[21] Although by its terms, Section 1679b(a) provides that "*no person* may . . . make or use any untrue or misleading representation of the services of the credit repair organization," 15 U.S.C. § 1679b(a) (emphasis added), courts have inferred from the provision as a whole and Congress' purpose in enacting the CROA that only a credit repair organization or a person associated with a credit repair organization can violate this provision. *See In re Wright*, No. 05-40829-JJR-13, 2007 WL 1459475 at *11-12 (Bankr. N.D. Ala. May 16, 2007); *Lopez v. ML# 3, LLC*, 607 F. Supp. 2d 1310, 1314 (N.D. Fla.2009). *But see Lacey v. William Chrysler Plymouth Inc.*, No. 02 C 7113, 2004 WL 415972, *7 (N.D. Ill. Feb. 23, 2004).

a violation of this prohibition "is not only a violation of the [CROA], 15 U.S.C. § 1679b(a)(3), but also an unfair or deceptive act or practice in commerce in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a)." *Id.* (citing 15 U.S.C. § 1679h(b)(1)).[22]

As discussed, the undisputed evidence establishes that Defendants falsely represented that they could, and for payment, would remove or help consumers remove any and all negative information from their credit reports. *See FTC v. Gill*, 265 F.3d at 956 (attorney's statements creating the false impression that he could legally and permanently have negative information removed from consumers' credit reports, even if the information was accurate and not obsolete, violated both the CROA and the FTC Act). Accordingly, the FTC is entitled to summary judgment as to Count VII.

### Remedy

Section 13(b) of the FTC Act provides that, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). Section 13(b) authorizes federal district courts to grant permanent injunctions "against practices that violate any of the laws enforced by the Commission." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996). Permanent injunctive relief is appropriate when "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980). In determining the likelihood of future violations, courts consider "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree

---

[22] 15 U.S.C. § 1679h(b)(1) provides that "[f]or the purpose of the exercise by the Federal Trade Commission of the Commission's functions and powers under the Federal Trade Commission Act, any violation of any requirement or prohibition imposed under this subchapter with respect to credit repair organizations shall constitute an unfair or deceptive act or practice in commerce in violation of section 5(a) of the Federal Trade Commission Act." Under this provision, "[a] violation of the CRO Act is to be treated as a violation of the FTC Act." *FTC v. Gill*, 265 F.3d at 949.

of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982).

Courts also have discretion to include "fencing-in" provisions that extend beyond the specific violations at issue in the case to prevent Defendants from engaging in similar deceptive practices in the future. *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some fencing in.") (internal quotation omitted); *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982) ("Fencing-in provisions serve to close all roads to the prohibited goal, so that [the FTC's] order may not be by-passed with impunity.") (internal quotation marks and citation omitted). " Fencing-in provisions must bear a 'reasonable relation to the unlawful practices found to exist.'" *Id.* (quoting *Colgate-Palmolive Co.*, 380 U.S. at 394-95).

Courts have also included monitoring provisions in final orders in FTC cases to ensure compliance with permanent injunctions. *See FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050, 2004 WL 5141452, at *4 (S.D. Fla. May 5, 2004) ("It is well settled that 'record-keeping and monitoring provisions . . . are . . . appropriate to permit the Commission to police the defendants' compliance with the order.'" (quoting *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla.1999)).

In addition to injunctive relief, Section 13(b) permits as ancillary relief, redress in the form of restitution and disgorgement of unlawfully obtained funds. *See FTC v. Gem Merch. Corp.*, 87

F.3d at 469-70; *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) (holding that the equitable powers granted in Section 13(b) include the power to order restitution and rescission of consumer contracts).

To obtain restitution on behalf of consumers, the FTC must show consumer injury but it is not required to show reliance by each individual consumer. *See McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000) (citing *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993)). "'A presumption of actual reliance arises once the [FTC] has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product.'" *McGregor*, 206 F.3d at 1388 (quoting *Figgie*, 994 F.2d at 605-06).

Here, Defendants disseminated their false representations to anyone who visited their website or called their telephone number. The undisputed evidence shows that numerous consumers were in fact misled by the misrepresentations and were harmed economically as a result. Crosby's contention that FTC cannot demonstrate reliance and injury by each RCA client, 2d Crosby Aff. ¶ 27, does not preclude summary judgment.

Final relief under Section 13(b) may include restitution of amounts paid by consumers. *See Gem Merch. Corp.*, 87 F.3d at 467-68 (affirming an award of consumer redress as calculated by consumers' losses and an order of disgorgement to the Treasury); *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir.1997) ("Courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers."); *McGregor*, 206 F.3d at 1387 (affirming contempt sanction in the amount of gross sales and stating in dictum that, "[i]n the underlying action, the sanctions imposed by the district court would have been authorized by Section 13(b) . . . ."); *FTC v. Stefanchik*, 559 F.3d at 931 ("[B]ecause the FTC Act is designed to protect consumers from economic injuries, courts have often

awarded the full amount lost by consumers rather than limiting damages to a defendant's profits.");

*FTC v. Home Assure, LLC*, No. 8:09-CV-547-T-23TBM, 2009 WL 1043956, at *2 (M.D. Fla. April 16, 2009).[23] In a Section 13(b) action of this kind, the proper measure of restitution is the purchase price of Defendants' services less any refunds paid to consumers. *See FTC v. Nat'l Urological Group*, No. 1:04-CV-3294-CAP, 2008 WL 2414317, at *33 (N.D. Ga. June 4, 2008) (citation and internal quotation marks omitted); *FTC v. Peoples Credit First, LLC*, 2005 WL 3468588 at *7 n.18.

In determining the amount of consumer losses, "[t]he Commission must show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate." *FTC v. Febre*, 128 F.3d at 535. The calculation may be properly based on estimates because sometimes that is the only information reasonably available. *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006). The absence of necessary information "does not automatically mean that the Commission's calculations are not reliable. '[T]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty.'" *FTC v. Febre*, 128 F.3d at 535 (quoting *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d

---

[23] As the FTC notes (Dkt. 99 at 21 n. 5), relying on *FTC v. Verity International, Ltd.*, 443 F.3d 48 (2d Cir. 2006), the Eleventh Circuit in *CFTC v. Wilshire Inv. Management Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008), held that the district court abused its discretion in awarding the full amount of customer losses because the proper measure of relief was "the amount that [Defendants] wrongfully gained by their misrepresentations." In *Verity*, the Second Circuit concluded that the district court erred under Section 13(b) in measuring restitution by the full consumer loss because the amount included sums paid to a middleman that never reached the defendant. *See* 443 F.3d at 68. The Second Circuit remanded with instructions "to further consider how much of this sum was in fact received by the [defendants] and is therefore subject to an order of restitution." 443 F.3d at 68.

However, *Verity* states that, if the consumer buys goods or services directly from the defendant, "it is not inaccurate to say that restitution is measured by the consumer's loss." *Verity*, 443 F.3d at 68 (citing *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469-70 (11th Cir. 1996)). The Court agrees that *Wilshire* does not unambiguously support the proposition that final relief under Section 13(b) cannot include consumer redress in the amount of gross revenues less refunds. *See FTC v. Home Assure, LLC*, 2009 WL 1043956, at *2-3. Here, although Defendants paid Liskiewicz a fee for supplying the trade lines, Defendants' purchased RCA's credit repair services directly from Defendants.

1215, 1232 (D.C. Cir. 1989)).

Additionally, consumer redress in the form of restitution of amounts paid by consumers is available in actions brought actions under Section 13(b) to enforce the CROA. *See FTC v. Gill*, 265 F.3d at 958. Such relief is particularly appropriate in actions to enforce the CROA, which includes a provision (not directly applicable here) permitting recovery of "any amount paid by the person to the credit repair organization" if the credit repair organization violates any provision of the CROA. *Id*. (quoting 15 U.S.C. § 1679g).

The FTC presents evidence that Crosby has associated himself with a new venture, www.creditambassador.com, that provides goods or services similar in some respects to those offered by RCA. *See* Mar. 15 2010 Declaration of Andrew Hernacki ("Hernacki 4th Supp. Decl." [Dkt. 99-3 at 92-132]) ¶¶ 7-10; *id*. Att. A at 1 (creditambassador.com website displaying video image of Crosby). On its website, using an alias "Chris Smith," Crosby offers to sell "e-books" on credit repair. Hernacki 4th Supp. Decl. ¶ 8. Some claims on the website resemble claims made on the RCA websites. *See* Hernacki 4th Supp. Decl. Att. A at 3 (video image of Crosby under the caption: "Amazing Credit Building Secrets Discovered by a 31 Year Old (Under-The-Radar) 'Credit Guru' Shows You How to Raise Your Credit Score into the 700's Without Wasting Money!" (emphasis in original).

When asked to clarify the nature of his association with www.creditambassador.com and its relation to RCA, Crosby invoked his Fifth Amendment privilege against self-incrimination. *See* Resp. to Pl.'s Second Set of Interrogatories to Def. Rick Lee Crosby (Dkt. 99-3 at 157-58), Nos. 21-25. In response to the FTC's motion, Crosby admits that creditamabssador.com is his new website, which sells books and offers free educational materials. 2d Crosby Aff. ¶¶ VII. However, Crosby

insists that this is not a "credit repair venture that provides products or services or 'tradelines' which are substantially similar to the RCA Credit website." 2d Crosby Aff. ¶¶ VII. At the least, this evidence indicates that the current ventures of Crosby, a self-styled credit "guru," present significant opportunities for similar violations of the CROA and the FTC Act. Moreover, Crosby appears to object to the proposed injunction as inconsistent with rights under the First Amendment.

The undisputed facts demonstrate that this is a proper case for permanent injunctive relief. However, the Court will defer ruling on the appropriate scope of an injunction (including whether, as the FTC requests, the injunction should include a broad fencing-in provision enjoining misrepresentations of material fact in connection with the sale of *any* goods and services) until after hearing evidence on the issue.

The undisputed facts also show consumer injury caused by Defendants' misrepresentations, restitution is an appropriate remedy for Defendants' violations of the FTC Act and the CROA. However, the undisputed facts do not unambiguously show the full extent of consumer injury or the reasonableness of the FTC's approximation of Defendants' wrongful gains.

First, the FTC seeks restitution of RCA revenues based on evidence of $351,529.16 in deposits to RCA bank accounts (the "RCA Accounts") during the period from September 1, 2005 to October 16, 2008, less refunds paid of $46,125.00.[24] Although the FTC's proposed amount

---

[24] *See* Hernacki 4th Supp. Decl. ¶¶ 3-6. *But cf.* Motion for TRO, Oct. 2, 2008 Declaration of Andrew Harnacki ¶¶ 5, 18, 30 and Att. D (records summary beginning January, 2006 for account ending 7706), E (records summary beginning January, 2006 for account ending 9247), F (records summary beginning November, 2006 for account ending 9453), G (records summary beginning August, 2007 for account ending 4902), H (records summary beginning August, 2007 for account ending 4936), I (records summary beginning August, 2007 for account ending 4944). Evidently, the FTC assumes that the deposits represent RCA's gross or estimated gross revenues for that period. The record includes some affirmative support for that assumption, *see* Crosby Dep. at 176-77, and Crosby does not challenge it or present evidence demonstrating that the FTC's calculations are inaccurate. *See FTC v. Gill*, 71 F. Supp. 2d at 1048-49 (relying on deposits to estimate gross revenues).

apparently covers deposits as far back as September 1, 2005, Crosby testified that RCA began selling trade lines in 2006. Crosby Dep. at 68. Favorably construed, this testimony suggests that the total deposits in the RCA Accounts during the proposed period may exceed the total amount paid by RCA clients.

Second, the FTC also seeks restitution to consumers of $172,191.91 in deposits during the same period into three bank accounts of another entity owned or controlled by Crosby,[25] MarketingWebTraffic.com, Inc., d/b/a International Platinum (the "Marketing Web Traffic Accounts"). To support the request, the FTC cites testimony of Miranda Wilson, Crosby's former assistant, to show that Crosby routinely co-mingled RCA and Marketing Web Traffic funds. *See* Wilson Dep. at 39:9-17 (agreeing that customer credit card payments for all Crosby's business, including Marketing Web Traffic, went into a single merchant services account), 40:18-25 (stating that all funds from the merchant services account went directly into Crosby's personal checking account).

However, as counsel for the FTC pointed out at an earlier hearing, *see* Dkt. 48 at 21-22, Wilson was employed by Crosby only until April, 2007. *See* Wilson Dep. at 21. More important, Crosby's denies the commingling. Crosby 2d Aff. ¶ 28. Crosby avers that Marketing Web Traffic never received funds from RCA clients, *id.* ¶ 29, and that all of International Platinum's assets were derived from its own separate business activities.[26] In short, the conflicting evidence precludes a

---

[25] *See* Crosby Dep. at 17-20; *cf.* 1st Crosby Aff. ¶ 3 (stating that Crosby is the chief executive officer of MarketingWebTraffic.com, Inc. and International Platinum, LLC); Childs Att. G at 1-6 (corporate filings listing Crosby as the CEO and registered agent of MarketingWebTraffic.com, Inc.).

[26] Dec. 3, 2008 Affidavit of Rick Lee Crosby, Jr. ("1st Crosby Aff." [Dkt. 38]) ¶ 9; *see also* Crosby Dep. at 172-73.

finding on summary judgment that restitution to consumers properly includes funds in the Web Marketing Traffic Accounts.

Third, the record contains evidence that, favorably construed, shows that several consumers were not misled by the representations alleged in Count II. One consumer states that his score was already in the high 600s or low 700s when he purchased Defendants' services. *See* Chiniquy Decl. ¶ 2. Moreover, RCA's records indicate that three other consumers did achieve credit scores over 700 after purchasing Defendants' services. *See* Crosby Dep. 150:8-12. Another consumer states that he was misled only to the extent that he never received the promised trade lines. *See* Bessant Dep. at 29, 50. Although this evidence does not preclude monetary relief in light of the undisputed evidence of consumer injury and the presumption of reliance noted above, *see FTC v. Amy Travel Serv., Inc.*, 875 F.2d at 572, it suggests that a finding as to the extent of consumer injury and the appropriate amount of monetary relief should be reserved until after a trial on the issues.

### Individual Liability

Individuals may be held personally liable for corporate FTC violations if the FTC shows that the individuals (1) participated directly in the deceptive acts or practices or (2) had authority to control them and had some knowledge of the practices. *FTC v. Gem Merch. Corp.*, 87 F.3d at 470 (quoting *Amy Travel Service*, 875 F.2d at 573). Authority to control a company's practices "may be demonstrated by active participation in the corporate affairs, including assuming duties as a corporate officer." *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005) (citing *Amy Travel Service*, 875 F.2d at 573).

The FTC presents evidence that Crosby participated directly in the misrepresentations regarding RCA's ability to remove negative credit items. Crosby admits that he was responsible for

the content of RCAcredit.com and RCAcreditservices.com, which display numerous instances of the misrepresentations. *See* RCA Response to Pl. 1st RFA Nos. 16-20; Crosby Dep. at 22:1-3, 43:15-44:3, 83:13-87:16. Moreover, Crosby sent numerous email messages containing the misrepresentations. *See* Crosby Dep. Crosby Dep. at 93-99 & Exs. 8-12.

The FTC also presents evidence that Crosby had authority to control RCA's business affairs. Crosby held himself out as president and owner of RCA. *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d at 1270 ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation."). Crosby had authority to hired RCA employees, *see* Crosby Dep. at 42:6-43:1 (Crosby hired Wellington), and he sometimes handled chargebacks and refund requests, *id.* at 80:1-81:18. He initially ran three of his companies, including RCA, from the same address. *See* Wilson Dep. at 18:2-17.

Moreover, undisputed evidence shows that Crosby knew that representations regarding Defendants' ability to raise credit scores were false, or at a minimum displayed reckless indifference to their truth or falsity. *See Amy Travel Service*, 875 F.2d at 574 ("The FTC is required to establish the [individual defendant] had or should have had knowledge or awareness of the misrepresentations, but that knowledge requirement may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.") (internal quotation marks and citation omitted). Crosby admits he cannot identify any consumers, other than three persons mentioned in RCA records, who achieved a credit

score over 700. *See* Crosby Dep. at 150:4-151:2.[27] Robert Liskiewicz testified that he and Crosby

discussed the fact that some trade lines were not appearing on consumers' credit reports. *See*

Liskiewicz Dep. at 59:21-60:8, and that he stopped working with Crosby because their actions did

not appear to be producing any results, *see id.* at 49:22-50:10; *see also* 34:2-8. Crosby stated that

paid another trade line provider, Steven DeJesus, several thousand dollars, but that Wellington

informed him (on the basis of client complaints) that DeJesus's trade lines "never showed up."

Crosby Dep. at 72:21-73:5. Other than Liskiewicz and DeJesus, Crosby did not identify any other

trade line providers. *See* Resp. to Pl.'s 1st Set of Interrogatories to Def. RCA Credit Services, LLC

(Dkt. 99-3 at 157-58), No. 2.

Finally, "the degree of participation in business affairs is probative of knowledge." *Amy*

*Travel Serv., Inc.*, 875 F.2d at 574. The FTC presents substantial evidence of Crosby's intimate

involvement in RCA's business affairs. Specifically, the FTC presents evidence that Crosby

designed the RCA websites containing the misrepresentations, hired sales staff, paid RCA's business

expenses, and was present at the RCA offices every day while it operated from Florida. Crosby Dep.

at 43:18-44:1; 42:10-43:8; 47:20-48:5; 49:4-6; 94:2-96:15; 80: 1-3; Wilson Dep. at 21:6-20.

In response, Crosby avers that he never personally sold anything to RCA Credit clients. 2d

Crosby Aff. ¶ 31,[28] and he asserts in his unsworn response that he never had "full control" of RCA,

Dkt. 100 at 4-5. As the FTC need not prove the contrary, the evidence and argument does not

---

[27] RCA records indicating that three consumers achieved credit scores over 700 after purchasing Defendants' services do not preclude liability under the FTC Act. *See Amy Travel Serv., Inc.*, 875 F.2d at 572 ("[T]he FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense under the FTCA.").

[28] *But see* Chiniquy Decl. ¶¶ 12-13.

preclude summary judgment.

Crosby further contends that all his actions were taken on behalf of RCA and the FTC has not demonstrated that RCA's "corporate veil" should be pierced. *Id.* ¶¶ 32-33. That is, Crosby attempts to resurrect a defense that, on his behalf, his counsel previously withdrew in response to the FTC's motion to strike it as legally insufficient. *See* Dkt. 58; Ans. at 13 (third affirmative defense). However, as already noted, Crosby may be held personally liable for RCA's violations of the FTC Act if the FTC shows that he participated directly in RCA's deceptive practices or had authority to control them and had some knowledge of the practices. *FTC v. Gem Merch. Corp.*, 87 F.3d at 470. The FTC presents undisputed evidence that he did.

### Conclusion

For the foregoing reasons, the FTC's Motion for Summary Judgment (Dkt. 99) is **GRANTED** in part. Summary judgment is granted as to Counts I and III-VII of the Complaint. Defendants are liable for monetary relief in the form of consumer restitution. However, genuine issues of material fact preclude summary judgment as to Count II as well as a determination of the extent of consumer injury, the specific amount of consumer redress for which Defendants are liable, and the proper scope of injunctive relief.

**DONE AND ORDERED** in chambers this 20th day of July, 2010.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record; *pro se* Defendant

29