UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**FEDERAL TRADE COMMISSION,**

**Plaintiff,**

v.  Case No. 8:08-CV-2062-T-27AEP

**RCA CREDIT SERVICES, LLC a Florida Corporation, et al.,**

**Defendants.**
_____/

## ORDER ON COUNT II

**THIS CAUSE** was tried before the Court on Count II of the Complaint, summary judgment in favor of Plaintiff having been entered on Counts I and III through VII of the Complaint. (Dkt. 125).[1] Count II alleges that Defendants violated the FTC Act and the Credit Repair Organization Act ("CROA") by falsely representing to consumers that they could "[b]oost Your Credit Score into the 700's in as Little as 30 Days." Based on the evidence presented, Plaintiff has proven by a preponderance of the evidence that Defendants, using instrumentalities of interstate commerce, made false, material representations likely to mislead consumers acting reasonably under the circumstances, in the course of offering to sell, for money, services and advice about services for improving a consumer's credit record, history, or rating. Defendants' actions were deceptive and violated the FTC, 15 U.S.C. § 45(a)(1) and the CROA, 15 U.S.C. § 1679a(3)(A).

---

[1] At commencement of trial, the Court summarized its finding and conclusions on Plaintiff's Motion for Summary Judgment. In the order which followed, the Court found that Defendants operated as a credit repair organization within the meaning of the CROA and that Defendant Crosby was individually liable for the violations alleged in Counts I and III through IV. (Dkt. 125). The evidence presented during the trial on Count II confirmed those findings.

*Findings and Conclusions*

### Section 5(a) of the FTC Act

Section 5(a) of the FTC Act prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). "To establish that an act or practice is deceptive, the FTC must show that (1) there was a representation or omission, (2) the representation or omission was likely to mislead consumers acting reasonably under the circumstances, and (3) the representation or omission was material." *FTC v. Peoples Credit First, LLC*, No. 8:03-CV-2353, 2005 WL 3468588, at *5 (M.D. Fla. Dec. 18, 2005) (citing *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)), *aff'd*, 244 F. Appx. 942 (11th Cir. 2007).

In determining whether a representation is likely to mislead consumers acting reasonably, the net impression created is considered. *See FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).[2] "A representation is material if it is of a kind usually relied upon by a reasonably prudent person." *FTC. v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007) (citation omitted). "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *Id.* at 1267.

---

[2] *See also Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982) ("'[T]he tendency of the advertising to deceive must be judged by viewing it as a whole' .... The impression created by the advertising, not its literal truth or falsity, is the [criterion].") (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976)); *FTC v. Peoples Credit First, LLC*, 244 F. Appx. 942, 944 (11th Cir. 2007) ("The fact that the words . . . are technically or literally true is not persuasive.").

### The Credit Repair Organizations Act

The CROA is intended

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

To achieve these ends, the CROA regulates the activities of "credit repair organizations," which are defined to include

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . . .

15 U.S.C. § 1679a(3)(A).

### The Facts

Defendant RCA Credit Services, LLC ("RCA") is a Florida limited liability corporation. (Exh. 90). Defendant Rick Lee Crosby, Jr. ("Crosby") is the founder and owner of RCA and was a managing member of the company. Defendants solicited consumers nationwide through two internet websites, www.RCACredit.com and www.RCAcreditservices.com. Interested consumers called RCA's toll-free number, heard a recorded message, and were invited to leave contact information. An RCA representative then contacted the consumers and pitched RCA's services.

The scheme promoted by Defendants involved adding their clients as authorized users to trade accounts owned by other consumers who had positive credit histories, commonly known as "piggybacking." Defendants represented that they could remove "ANY or ALL negative accounts"

3

from the client's credit report (Count I), and "add 15 YEARS of positive payment history to their credit file overnight without occurring ANY debt or liabilities." Defendants represented "100% guaranteed results with ANY of our PROVEN credit building techniques." (Exhs. 87, 88, 89).

Relevant to Count II, the websites represented to consumers that RCA's techniques would "Boost Your Credit Score Into the 700's in as little as 30 days." The same representation was repeated on RCA's website in a "talking head" audio by an animated character purporting to be Crosby (Exh. 88), in emails to consumers, in prerecorded messages consumers heard when they called RCA, and during telephone calls with RCA representatives. (*See* Declaration of Jeannette Harris, ¶¶ 3, 7-8 (RCA representative Brady Wellington told Harris that her credit score would improve to over 700 within a month); Declaration of Carmela Marolda, ¶ 11 (Wellington told Marolda that her credit score would rise to over 700 within 30 days)).

After viewing the RCA website, FTC investigator Childs made a recorded undercover telephone call in September, 2008 to RCA. She was told by an RCA representative ("Zach") that once she became a client, the results were "100% guaranteed." Zach told Childs that by adding lines of credit, she would achieve about a 70% increase in her credit score within 30 to 90 days of signing the agreement. Each trade line would cost $500 and would be payable upon signing of the agreement.

FTC investigator Stahl also made several recorded undercover calls to RCA, eventually speaking with Defendant Brady Wellington. After her first attempt to reach RCA, Wellington left a message telling Stahl that if she was looking to increase her credit score into the 700s in as little as 30 days, to leave her name and number. Stahl did so and Wellington returned her call. In a subsequent discussion, Wellington explained the "three step" process involved (1) adding positive

4

payment history to her credit ("piggybacking"), which would take 30 to 90 days to show on her credit, (2) helping her remove negatives on her credit history, and (3) assisting in obtaining financing. Wellington advised Stahl that Crosby owned the business and that they made their money with the trade lines. He relayed that credit repair was a service and while they could not guarantee a service, that "70% of our customers walk out with the 700 score."

### Consumer harm

The evidence, including the testimony and declarations of consumers who purchased services from RCA (Mitchell, Jones, Smith, Harris, and Marolda), established that numerous consumers, in reliance upon Defendants' false representations, paid fees to Defendants in various amounts, expecting their credit scores to increase into the 700s by being added the trade lines and having negatives removed from their credit history.

Bryne Mitchell contacted RCA after seeing its website. He had a credit score of 580-600 at the time. After speaking with Wellington, who asked him to send his payment by priority mail, he paid $800 to RCA with the understanding that his credit would be repaired, negatives on his credit would be dropped, and his score would increase as a result. Mitchell never received any benefit from RCA. On his own, however, he achieved a score of 700-740.

Melvina Jones had a score in the mid 500s to 605 when she contacted RCA after viewing its website. RCA's website stood out to her because it offered to "increase her score to the 700s in as little as 30 days." In a subsequent conversation, Wellington confirmed the information about raising her score to the 700s in as little as 30 days. When she received the Confirmation Agreement from RCA, she called Wellington and questioned him about the disclaimer stating that it could take 60 to 90 days. Wellington told her that most of their clients' scores were raised within 30 days. After

speaking with Wellington, Jones signed the Confirmation Agreement and payment authorization, remitting $1500 to RCA. (Exhs. 41, 42, 43).[3] She expected her score to increase into the 700s within 30 days.

After seeing no change in her credit score, Jones began emailing Wellington. During that email exchange, Wellington misrepresented to Jones that three trade lines had been added to her credit. (Exh. 46). After waiting 90 days for changes to her credit score to appear, Jones requested a refund. Wellington offered her half of her money back but Jones never received the refund.

Subsequently, Jones received an email from "Rick_RCAcredit.com," which identified the "author" as Rick Crosby, the "president and founder of RCAcredit.com." (Exh. 48). Crosby's email repeated essentially the same representation which was on RCA's website: "If you would like to learn how to increase your credit score into the 700s or above in as little as 30 days by legally adding positive payment history to your credit file, please click the link below for a FREE Credit Score Analysis." That email referenced the telephone number 1-866-631-0409, the same number on RCA's website. Three months later, Jones received another email solicitation from "help@rcacredit.com," alluding to "World famous credit guru, Rick Crosby . . ." The author promised to "COMPLETELY REMOVE EVERY NEGITIVE [sic] from your file in 7 days and raise your FICO score instantly." (Exhs. 49, 50).

Donald Smith contacted RCA after seeing its website. What stood out to Smith was the representation that credit scores could be increased in 30 days to over 700. His score at the time was

---

[3] Wellington told her that RCA would reimburse her $100 if she wired her fee. (Exh. 44). When she contacted Wellington about the reimbursement, he told her he could not honor it but that he would send her an International Platinum Credit card with a $3500 limit. (Exh. 45). Jones never received the credit card.

in the 650-660 range. Smith spoke with Wellington and "Zach" at RCA, both of whom told him they could help him increase his credit score by using trade lines. After he paid the $600 fee, he was faxed an agreement. Relying on the representation on the website, he expected an increase in his score within 30 days. After seeing no change, he began calling RCA and was told that it sometimes took 60 days. After 60 days passed without any changes, he was told it could take 90 days. Eventually, Wellington offered Smith half of his money back, which Smith never received. (Exhs. 54-56). Thereafter, Smith received solicitations from Rick Crosby about deleting negative credit information from his report (Exhs. 58, 59, 60). Smith's credit score never improved as a result of anything RCA did.

Consumers Jeanette Harris and Carmella Marolda had similar experiences with RCA as did Mitchell, Jones, and Smith. (Exhs. 36 - 38; 51).[4]

### Expert testimony

The testimony of Paul Panichelli, a principle scientist with Fair Issac Corporation ("FICO"), was credible and persuasive. He explained that FICO credit scores were widely use, and that 75 - 90% of financial institutions relied on FICO scores. He opined that RCA's representation that a consumer's credit score could be boosted into the 700s in as little as 30 days was not generally achievable. With respect to one's credit score, there are numerous contingencies involved and that representing that one's score could be raised to the 700s without knowledge of the individual's credit history would be false. He further opined that use of "piggybacking" would not produce consistent results for all consumers because of the many variables involved, and that purchasing trade accounts would not generally improve scores for consumers. Based on his research and testing, he opined that

---

[4] These declarations were admitted pursuant to Rule 807, Fed.R.Evid.

a "vast majority" of consumers, approximately 95%, would not see an increase in their scores using trade accounts. Panichelli was aware of no technique which would increase scores into the 700s in 30 days.

Based on the testimony and evidence presented, particularly the testimony of Paul Panichelli, Defendants' representations that RCA could "boost" consumers' credit scores into the 700s "in as little as 30 days" were false and material. Those misrepresentations, the assurances of "100% Guaranteed Results With ANY of OUR PROVEN Credit Building Techniques," and the references to "81,894 Total Satisfied Clients," were likely to mislead consumers acting reasonably under the circumstances. (Exhs. 87, 89). That it may be possible for a consumer's credit score to increase into the 700s by using trade accounts does not negate the false impression RCA created that a consumer's credit score would be boosted in as little as 30 days. Nothing in the Confirmation Agreement purporting to be a disclaimer or qualifier mitigated against the false nature of these statements or this false impression communicated to consumers.

### Rick Crosby's individual liability

Individuals may be held personally liable for corporate FTC violations if the FTC shows that the individuals (1) participated directly in the deceptive acts or practices, or (2) had authority to control them and had some knowledge of the practices. *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996)(quoting *FTC v. Amy Travel Service*, 875 F.2d 564, 573 (7th Cir. 1989)). Authority to control a company's practices "may be demonstrated by active participation in the corporate affairs, including assuming duties as a corporate officer." *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005) (citing *FTC v. Amy Travel Service*, 875 F.2d at 573).

The evidence established that Crosby participated directly in the misrepresentations regarding

RCA's ability to boost credit scores into the 700s in as little as 30 days. Crosby acknowledged that he was responsible for the design and content of the websites in which the misrepresentations appeared. He is identified as the author of emails containing the same misrepresentation (Exhs. 48, 71). He communicated via email to RCA clients. (Exhs. 31, 32). Crosby was depicted as the "talking head" in the animated video on the RCAcredit.com website. (Exh. 88). He is described as a "world famous credit guru." (Exhs. 49, 50, 58, 59, 60). Client payments to RCA were deposited into Crosby's personal account and Crosby paid the business expenses of RCA.

Crosby had authority to control RCA's business affairs. He acknowledges that he was the president and founder of RCA and hired its employees. *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d at 1270 ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation."). The evidence demonstrated that he had control over and knowledge of the misrepresentations disseminated through RCA's websites.[5]

Finally, "the degree of participation in business affairs is probative of knowledge." *FTC v. Amy Travel Serv., Inc.*, 875 F.2d at 574. Crosby knew that representations regarding RCA's ability to raise credit scores into the 700s in a short period of time were false. At a minimum, he displayed reckless indifference to the truth or falsity of that claim. Robert Liskiewicz and Crosby discussed the fact that some trade lines were not appearing on consumers' credit reports. (*See* Liskiewicz Dep. at 59:21-60:8, and that he stopped working with Crosby because their actions did not appear to be producing any results, *see id.* at 49:22-50:10; *see also* 34:2-8).

In sum, Crosby is personally liable for RCA's violations of the FTC Act and the CROA, as

---

[5] To the extent Crosby attempted to distance himself from the representations on the websites and those made by Wellington and "Zach," his credibility as a witness was undermined by his evasive answers to questions, his sarcastic commentary and his illogical and erroneous explanations and rationalizations for his conduct and that of RCA. Simply put, he was not a credible witness.

the FTC has proven that he participated directly in RCA's deceptive practices, had authority to control them, and had knowledge of the practices. *FTC v. Gem Merch. Corp.*, 87 F.3d at 470.[6]

*Remedy*

Having found that Defendants violated the FTC and CROA, as alleged in Counts I through VII of the FTC's Complaint, permanent injunctive relief is appropriate. Section 13(b) of the FTC Act provides that, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). Section 13(b) authorizes federal district courts to grant permanent injunctions "against practices that violate any of the laws enforced by the Commission." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996). Further, permanent injunctive relief is appropriate when "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980). "Fencing-in" provisions, so long as they bear a reasonable relation to the unlawful practices found to exist that extend beyond the specific violations at issue, can also be utilized to prevent Defendants from engaging in similar deceptive practices in the future. *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965); *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982).

In determining the likelihood of future violations, "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful

---

[6] The FTC proved by a preponderance of the evidence that Defendants operated as a credit repair organization within the meaning of the CROA. Defendants used an instrumentality of interstate commerce, including the internet and telephone communications, to sell, provide, or perform (or represent that they could do so), in return for money, services or advice about services for the purpose of improving a consumer's credit record, credit history, or credit rating. *See Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 511 (N.D. Ga. 2006)(citing 15 U.S.C. § 1679a(3)).

nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations" are proper considerations. *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982).

Here, the evidence established that Crosby will likely, unless restrained, continue to offer credit repair services using dubious claims and misrepresentations. As recently as June 2010, Crosby offered credit repair service to consumers using exaggerated and questionable claims remarkably similar to those in the RCA websites. On the website for creditambassador.com., which Crosby formed and designed, Crosby describes himself as "31 year old (Under the Radar) 'Credit Guru.'" (Exh. 82A; (video image of Crosby, using the alias "Chris Smith," under the caption: "Amazing Credit Building Secrets Discovered by a 31 Year Old (Under-The-Radar) 'Credit Guru' Shows You How to Raise Your Credit Score into the 700's Without Wasting Money!" (emphasis in original)).

Crosby promotes his "Credit Ambassador Blackbook," which Crosby describes as an "e-book," for $197.00. (Exh. 82A, p. 17). The website includes a "100% Money Back Guarantee #1 No Questions Asked Refund," a "No Risk #2 Bullet Proof 125 % Guarantee" and represents "[i]f you are ready to increase your credit score into the 700's and get approved for any bank loan, **then this course is for you.**" (Exh. 82A; Defense Exh. 506, 507).[7] Based on this evidence, an appropriate "fencing in" provision in the injunction is necessary.

In addition to injunctive relief, Section 13(b) permits ancillary relief in the form of restitution and disgorgement of unlawfully obtained funds. *See FTC v. Gem Merch. Corp.*, 87 F.3d at 469-70;

---

[7] An example of Crosby's misguided, if not dishonest tactics, is his use of the alias "Chris Smith," on the creditambassador.com website. According to Crosby's misguided reasoning, by registering that alias as a fictitious name, he may offer his credit repair services under the alias, or essentially anonymously. (Def. Exh. 507). That is simply not the case. The Florida Statutes do not authorize an individual such as Crosby to conduct business anonymously by use of an alias. See Fla. Stat. § 865.09.

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984). The amounts paid by consumers to RCA and deposited into RCA's bank account reflect "ill gotten" gains. *Commodities Futures Trading Commission v. Wilshire Investment Management Corporation*, 531 F. 3d 1339, 1345 (11th Cir. 2008); *FTC v. GEM Merchandising Corporation*, 87 F.3d 466, 470 (11th Cir. 1996). The evidence established that $397,654.16 was deposited into RCA's bank accounts from September 1, 2005 to October 16, 2008, with refunds and charge backs totaling $46,125.00. The net wrongful gain by Defendants is accordingly $351,529.16. (Hernacki testimony; Exhs. 72D, 72E, 72G, 81).

The evidence established that funds paid by consumers went directly into a merchant services account shared by RCA with two other concerns owned and controlled by Crosby, Legalcredit.com and MerchantWebtraffic.com, Inc., d/b/a International Platinum. The FTC seeks restitution of $172,191.91, representing deposits from the shared merchant services account during the same time into the bank accounts of those entities, on a theory of co-mingling and control by Crosby. The evidence does not support the relief the FTC seeks.

Miranda Wilson, Crosby's former assistant, confirmed that Crosby co-mingled RCA, Legalcredit.com, and MarketingWebtraffic funds in the merchant services account and Crosby's personal account. She testified, however, that the businesses were operated separately and that separate books were maintained. Although Wilson left her employment with RCA in April/May 2007, there was no evidence indicating that Crosby handled the finances of his businesses any differently after she left.

Notwithstanding the co-mingling of funds, there was no evidence that Legalcredit.com. or Marketingwebtraffic received funds from RCA clients. The evidence suggested that these businesses generated their own revenue from their separate business activities. However, RCA client funds

were deposited into Crosby's personal account, from which he funded RCA and paid its expenses. These funds are therefore tainted by the fraudulent activities of RCA and Crosby.

The Temporary Injunction froze deposits at various bank accounts utilized by Crosby in running his various concerns. Those funds belonging to International Platinum, LLC., at WAMU ($9,227.39) and Southern Commerce Bank ($5,619.04) are due to be released from the injunction. The funds on deposit in Crosby's individual name at JP Morgan Chase ($3,760.76) and RCAcreditservices, LLC., ($3,468.50) are to be applied toward restitution.

Accordingly, Judgment in favor of Plaintiff shall enter, including restitution and permanent injunctive relief. A Final Judgment and Permanent Injunction Order will follow.

**DONE AND ORDERED** in chambers this 28th day of July, 2010.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record
Defendant, *pro se*